UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

PATRICK JEANTY,

                                  Petitioner,

       vs.                              9:00-CV-1752
                                        (J. Hurd)

MICHAEL McGINNIS,
Superintendent,

                                  Respondent.

_____

APPEARANCES                    OF COUNSEL

PATRICK JEANTY
Petitioner pro se

ELIOT SPITZER                  STEVEN H. SCHWARTZ
Attorney General of the           Principal Attorney
State of New York
Attorney for Respondent

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

    This matter has been referred to me for Report and Recommendation by the

Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636

(b) and Local Rules N.D.N.Y. 72.3(c).

    Petitioner has brought this action for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.  Petitioner challenges a March 17, 1998 judgment of conviction of the

Schenectady County Court.  Petitioner was convicted after a jury trial of Murder,

Second Degree; three counts of Robbery, First Degree; two counts of Burglary,

Second Degree; and two counts of Assault, First Degree. He was sentenced as a second violent felony offender to an aggregate of 75 years to life imprisonment. The Appellate Division, Third Department affirmed petitioner's conviction after a slight modification in the calculation of his sentence, and the New York Court of Appeals denied leave to appeal on January 13, 2000. *People v. Jeanty*, 268 A.D.2d 675, 702 N.Y.S.2d 194 (3d Dep't 2000), *leave to appeal denied sub nom People v. Johnson*, 94 N.Y.2d 949, 710 N.Y.S.2d 5, 731 N.E.2d 632 (2000). On April 3, 2000, the New York Court of Appeals denied reconsideration. *People v. Jeanty*, 94 N.Y.2d 945, 710 N.Y.S.2d 1, 731 N.E.2d 618 (2000).

Petitioner filed this petition on November 16, 2000, and respondent filed his answer and memorandum of law on May 7, 2001. (Dkt. Nos. 1, 10-11). Petitioner filed a traverse and memorandum of law in support of his petition. (Dkt. Nos. 13-14). However, on January 26, 2004, petitioner filed a motion to stay this action so that he could return to state court for further proceedings. (Dkt. No. 18). This court granted petitioner's motion with the requirement that petitioner file his state court action within a specified time and inform the court if a decision in state court was not made within a specified time. (Dkt. No. 20).

On September 29, 2004, petitioner returned to this court with a motion to amend his petition to add a new claim that he had exhausted in state court. (Dkt. No. 25). On December 21, 2004, I lifted the stay in this action and denied the motion to amend

2

because petitioner had attempted to raise a ***new claim***, unrelated to the claims asserted in the original petition, and that was barred by the statute of limitations. (Dkt. No. 27). Petitioner's appeal of my decision was denied on June 24, 2005 by Judge Hurd. (Dkt. No. 32). This case is now ready for decision on the claims originally raised by petitioner which have been fully briefed.

Petitioner raises the following claims:

1.     The trial court erred in failing to afford petitioner a hearing on the admissibility of a tape recorded telephone conversation.

2.     The trial court erred in permitting the admission of evidence of petitioner's uncharged drug crimes.

3.     The sentence imposed was harsh, excessive, and unauthorized by law.

Respondent argues for denial of petitioner's claims on the merits and has filed the pertinent state court records,[1] together with a memorandum of law. For the following reasons, this court agrees with respondent and will recommend denial of the petition.

## DISCUSSION

**1.     <u>Facts</u>**

On March 12, 1997, petitioner and two other individuals, James Young and Rashad Scott participated in a burglary and robbery that resulted in the death of Denise Toyloy and serious injury to Ms. Toyloy's boyfriend Richard Vale, with whom

---

[1] The state court records are listed on page 2 of respondent's answer. (Dkt. No. 10).

Ms. Toyloy and her infant child were living at the time of the crime.  Petitioner and

Mr. Young were crack cocaine dealers, and Ms. Toyloy was one of petitioner's

customers, with whom he had also developed an intimate relationship in order to trade

sex for drugs. Record on Appeal[2] (RA) 338.  Mr. Young and ***thirty seven*** other

witnesses testified against petitioner at his three week trial.

Mr. Young testified that he and petitioner were friends when they both lived in

Brooklyn, New York. (RA 328).  Mr. Young then moved to Schenectady, where he

ultimately developed a drug business and encouraged petitioner to move to

Schenectady and join him in the business. (RA 328-32, 333-34).  The two men sold

drugs from various locations, with one location being 407 Summit Avenue in

Schenectady, and petitioner also sold drugs from 404 Summit Avenue[3]. (RA 335).

Mr. Young stated that petitioner met Ms. Toyloy through petitioner's drug sales at 407

Summit Avenue. (RA 337-38).  Mr. Young was subsequently introduced to Ms.

Toyloy. (RA 338-39).

Mr. Young testified that his sister, Yolanda, lived with her two sons and Scott

Kahler in an apartment above a laundromat on Eastern Avenue in Schenectady. (RA

340).  Mr. Young resided down the block from his sister on Eastern Avenue in an

---

[2] The Record on Appeal does not contain all the pages of the trial transcript.  The court will generally cite to the page indicated in the Record on Appeal (RA), but will cite to the transcript itself if the cited material does not appear in the Record on Appeal.

[3] Mr. Young testified that he sold from Lafayette Street and 407 Summit, but that while petitioner sold from 404 Summit, Young did not sell from that location. (RA 336).

apartment he shared with his wife, Nancy.[4] (RA 331).  After Yolanda and Scott went to jail for a time in December of 1996, petitioner began staying at Yolanda's apartment.[5] (RA 340).

Approximately two or three weeks prior to the crime, petitioner spoke to Mr. Young about Denise Toyloy. (RA 345-46).  Petitioner told Young that there was a safe in Denise's house, and they devised a plan to steal the contents of the safe.[6] (RA 346-47).  Petitioner told Young that petitioner would go over to Denise's house and leave a window open so that he and Young could get in later through the open window. (RA 347, 350).  They would subdue Denise, wait for her boyfriend to come home, subdue him, and get the combination of the safe from him. (RA 347).

Petitioner and Mr. Young also determined that they would need a third person to participate in the crime because Ms. Toyloy knew both petitioner and Mr. Young and would recognize them. (RA 348, 350).  The two men enlisted the assistance of Rashad Scott, an individual who sold drugs for Mr. Young. (RA 342-43).  The plan was that Scott would enter the house through the window left open by petitioner, subdue Ms. Toyloy using duct tape, and get her out of the way so that Young and petitioner could enter the house without being recognized, and the three men would

---

[4] Nancy is identified by Mr. Young as his wife later in the transcript, but is even later referred to as Mr. Young's "girlfriend." (RA 358, 399).

[5] Yolanda's children stayed at Mr. Young's house with Nancy. (RA 341).

[6] They assumed that there was money in the safe. (RA 347).

wait for Mr. Vale to come home. (RA 348).  When Mr. Vale came home, they would force him to turn over the combination of the safe. (RA 348-49).

The trio first attempted the robbery on March 10, 1997, but had to abort the attempt when Mr. Young was arrested for aggravated unlicensed operation of the car that he was driving to the burglary/robbery. (RA 351-54).  The car was impounded until March 12, 1997, the day of the crime. (RA 356).  On March 12, 1997, Mr. Young picked up his impounded car. (RA 356-57).  Petitioner, Nancy, and Mr. Young's daughter were with Mr. Young when he picked up the car. (RA 357).  After they left the police station, Mr. Young dropped petitioner off at Yolanda's apartment, and Young, his wife and his daughter went out to lunch. (RA 350-60).  After lunch, they went back to Mr. Young's house, and petitioner arrived with his car shortly thereafter. (RA 360-61).

Mr. Young testified that petitioner then told Young "about the window" and that they could "do the robbery today." (RA 361).  Petitioner left to get Rashad Scott, came back, picked up Mr. Young, and the three men went to Price Chopper to purchase stockings and duct tape for the crime. (RA 361-62).  Mr. Young was carrying a gun. (RA 361).

The crime began as planned. (RA 363-64).  Mr. Scott got out of the car with a stocking and the duct tape and proceeded toward the window that petitioner had left open, while petitioner and Mr. Young drove around the block until Mr. Scott had time

to "tie [Ms. Toyloy] up and cover her face" so Young and petitioner could enter the house. (RA 364). When petitioner and Young entered the house, they saw Mr. Scott on top of Ms. Toyloy, her head was covered , and she was lying motionless on her stomach. (RA 366-67).

Young made sure that Ms. Toyloy was covered, went to the kitchen to get a knife, used the knife to cut a telephone cord, and tied Ms. Toyloy's hands and feet. (RA 369). Young also tied the material that was covering Ms. Toyloy's head so that she would not see the men. (RA 369). The three men moved Ms. Toyloy into the kitchen so that Mr. Vale would not see her when he got home. (RA 369-70). Mr. Young testified that as the three men waited for Mr. Vale to come home, Mr. Young noticed that Ms. Toyloy was still not moving, and Mr. Young ultimately determined that she had no pulse. (RA 370). Mr. Young told petitioner, and they both agreed that Ms. Toyloy was dead. (RA 372). They asked Mr. Scott what he had done and he told them that he had to "put her to sleep because she was screaming." (RA 373).

The three men then waited for Mr. Vale to come home, with Ms. Toyloy dead in the kitchen and her daughter asleep in the bedroom. (RA 374-77). After approximately two hours of waiting, Mr. Scott was looking out the front window and alerted the others that Mr. Vale had arrived. (RA 379). When Mr. Vale entered the house, the three men attacked him, and hit him with the gun, their fists, and their feet. (RA 380). Mr. Young had brought handcuffs, which they used to immobilize Mr.

Vale. (RA 378-81).

The safe was in the basement, and the three men asked Mr. Vale for the combination of the safe, which he ultimately gave them, however, Mr. Young and petitioner were unsuccessful in attempting to open the safe themselves. (RA 382). Mr. Young testified that when they could not open the safe, he and petitioner dragged Mr. Vale downstairs by the handcuffs. (RA 383). Mr. Vale opened the safe, and, petitioner and Mr. Young emptied the safe and took the money. (RA 384). After they had taken the money, they tied Mr. Vale's legs with some rope, left him down in the basement, and left the house. (RA 384-85).

After the three men left Mr. Vale's house, they drove back to Mr. Young's house, and took off their blood-stained clothing. (RA 389). Mr. Young took the bloody clothing, placed it in a blanket or a bag, took the clothing to an alley and burned the clothes after soaking the clothes in gasoline. (RA 390-94). Mr. Young also testified to his, petitioner's, and Mr. Scott's actions after the crime in attempting to escape detection and arrest. (RA 395-400).

The prosecution also presented evidence in the form of a tape recording of telephone conversations coming into and going out of Mr. Vale's house on March 12, 1997. Mr. Vale was aware that Ms. Toyloy was a drug addict and had discouraged her from using his telephone to purchase drugs. In order to do this, Mr. Vale testified that he had installed a recording system that would record all incoming and outgoing

telephone calls. (RA 57-58).  Mr. Vale testified that he also had "caller-ID" installed on his telephone. (RA 63).  Mr. Vale told Ms. Toyloy that he was taping the calls and that he would "turn-in" her drug dealers. (RA 66).

During Mr. Young's testimony, the prosecutor played one of the telephone calls that had been recorded on Mr. Vale's system on March 12, 1997. (RA 400-401).  Mr. Young  identified the voices on the tape as those of petitioner and Ms. Toyloy, and a transcript was made of the call in question. (RA 401, 475).  Mr. Young also testified that **petitioner** knew that Ms. Toyloy's telephone calls were being recorded. (RA 401).

It is clear from the transcript of the telephone call that Ms. Toyloy was trying to tell petitioner that he could no longer call Vale's house because the calls were being recorded. (RA 475-76).  Ms. Toyloy begged petitioner to come to her home, and although petitioner initially stated that he had no car, he ultimately told Ms. Toyloy that he would "get a way over there." (RA 475-76).  The call was identified from the "caller-ID" feature by a police investigator as originating from "Tom's Tanning" at 11:05 a.m. on March 12, 1997. (RA 164, 473).  Yolanda Young had testified that her apartment was above a laudromat named "Tam's [sic] Tanning". (RA 210).  Ms. Young also testified that she had no telephone service in her apartment, so that if someone wished to make a call, he or she would go downstairs to the laundry, where there was a pay telephone. (RA 220).

Dr. Barbara Wolf, a forensic pathologist testified that Ms. Toyloy died of

asphyxiation. (RA 147).  Dr. Wolf examined the body and also determined that prior to her death, Ms. Toyloy had received substantial injuries to her head and facial area. (RA 135-41).  One of the emergency room doctors on duty on the night of the crime testified to Mr. Vale's serious injuries. (RA 304-19).

**2.    Standard of Review**

The standard of review in a habeas action depends upon whether the state court considered petitioner's constitutional claims "on the merits."  The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254 unless the state court ruling *on the merits* of a federal constitutional issue was either "'contrary to ... clearly established Federal law' or 'involved an unreasonable application ... of clearly established Federal law.'" *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir.)(quoting 28 U.S.C. § 2254(d)(1))(alterations in original), *cert. denied*, 534 U.S. 886 (2001).  The statute further provides that the court may grant a writ of habeas corpus when a claim that was considered on the merits by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-13 (1995).  When presented with these

10

questions, the court was empowered to conduct an independent review of the record. *Id.* The factual findings of the state court, however, were presumed to be correct absent circumstances listed in the statute, such as cases in which the factual finding was not fairly supported by the record. 28 U.S.C. § 2254(d) & (d)(8). The AEDPA requires the court to apply a more deferential standard, placing new restrictions on the power of federal courts to grant writs of habeas corpus to state inmates. *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

In order to apply the AEDPA standard, the petitioner's claim must have been "adjudicated on the merits" in the State court proceedings. 28 U.S.C. § 2254(d)(1). Additionally, the AEDPA provides that a state court's fact findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. *Id.* § 2254(e)(1). If the State court has failed to adjudicate a claim "on the merits", the pre-AEDPA standard of review applies, and the court reviews both questions of law and mixed questions of law and fact *de novo*. *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

A state court's decision is contrary to federal law if it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. at 413. A state court unreasonably applies clearly established federal law when the correct principle is

11

identified, but the state court unreasonably applies that principle to the facts of the

petitioner's case. *Id.*

3.   **Admission of Tape Recorded Telephone Conversation**

Petitioner's first claim is that the trial court erred in denying petitioner's motion

to suppress the audio tape, created by Mr. Vale's automatic taping system on the day

of the crime.  In the petition, petitioner does not specifically challenge the admission

of the tape, rather, the trial court's failure to grant petitioner a hearing prior to denying

the motion to suppress.

The trial court denied petitioner a hearing on his motion because the court

found that petitioner lacked standing to bring the motion to suppress.  Petitioner

moved to suppress the tape prior to trial, arguing in an affirmation signed by his

attorney, that petitioner never consented to the tape recording, and requesting a

hearing to determine whether Ms. Toyloy consented to the recording. (RA 2-4).  The

prosecutor opposed the motion, arguing that petitioner had no standing to challenge

the admission of the tape because he had not shown that he was an "aggrieved person"

under the Federal Wiretap Statute, 18 U.S.C. § 2515. (RA 5-8).  The prosecutor also

argued that the federal statute did not apply to a homeowner taping calls in his own

home. (RA 8).

The trial court agreed, and held that in order to seek suppression, the petitioner

would have to allege that ***his*** Fourth Amendment rights had been violated, and in the

12

case of an intercepted conversation, would have to show that he was an "aggrieved person" under 18 U.S.C. § 2510(11). (RA 12).  In order to make this showing, petitioner would have to ***admit*** that he was a party to the intercepted conversation. The court found that petitioner had failed to do so in his moving papers and thus, denied petitioner's motion without a hearing. *Id.*

On appeal, petitioner claimed that his attorney's affirmation that petitioner never consented to Mr. Vale intercepting any of petitioner's telephone conversations implicitly alleged that he was a party to the conversation. Petitioner's Brief to the Appellate Division at 14.  Petitioner also relied upon the fact that the prosecution would try to show at trial that petitioner ***was*** a party to the conversation.  Petitioner appears to have claimed that if the prosecution believed that petitioner was a party to the conversation, this belief would afford petitioner the standing to challenge the admission of the audio tape. *Id.*

The Appellate Division disagreed with petitioner and found that in moving to suppress, petitioner "failed to submit sworn allegations of fact that he was a participant in the subject phone conversation; ... thus, he failed to demonstrate that he was an "aggrieved person" with a legitimate expectation of privacy and standing to challenge the admissibility of the audiotape." *People v. Jeanty*, 268 A.D.2d at 678-79, 702 N.Y.S.2d at 199.  The court cited both New York State statutory requirements for motions to suppress as well as federal case law and the section of the Federal Wiretap

Statute cited by both petitioner and the prosecutor in their briefs. *Id.* The court also specifically stated that

> allegations of defendant's attorney that defendant had never consented to Vale's taping any of his phone conversations and that he anticipated that the People would endeavor to prove at trial that defendant was a party to the subject conversation ***did not satisfy defendant's burden in moving to suppress of submitting motion papers containing sworn allegations of fact establishing his aggrievement.***

*Id.* 268 A.D.2d at 679 n.3, 702 N.Y.S. 2d at 199 n.3 (emphasis added). In making this determination the court cited *inter alia* N.Y. CRIM. PROC. LAW § 710.60(1).

First, the court notes that petitioner is not challenging the admission of the tape under the Fourth Amendment. However, insofar as petitioner's suppression claim could be interpreted as a claim under the Fourth Amendment, it would be barred by *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id*. at 481-82; *see also Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992).

The Second Circuit has determined this to mean that review of a Fourth Amendment claim on habeas review is proper only if: (1) the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (2)

14

the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in that process. *See Capellan*, 975 F.2d at 70; *Gates v. Henderson*, 568 F.2d 830, 839-40 (2d Cir. 1977) (en banc), *cert. denied*, 434 U.S. 1038 (1978).

New York provides an approved mechanism for litigating Fourth Amendment claims. *See Capellan*, 975 F.2d at 70.  Petitioner attempted to use this mechanism, but the court determined that he had not submitted the appropriate affidavits, and because of this, he failed to show that he had standing to challenge the admission of the evidence.  The failure to properly use the mechanism for suppression does not constitute an "unconscionable breakdown" in the process.  Therefore, to the extent that petitioner's claim can be interpreted as a Fourth Amendment claim, it may be dismissed.

Next, the court must determine whether the Appellate Division denied this claim on the merits of a federal constitutional issue.  The Appellate Division determined that the trial court did not err in denying the motion to suppress without a hearing. It has been held that a defendant has no right, constitutional or otherwise to a suppression hearing under all circumstances. *United States v. Kevin*, 97-CR-763, 1999 U.S. Dist. LEXIS 5728 *32 (S.D.N.Y. April 7, 1999)(citing *inter alia United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989)).  Therefore, if the Appellate Division simply decided, based upon state law, that the trial court was correct when it

15

did not afford petitioner a hearing because petitioner failed to submit the proper affidavit, the Appellate Division did ***not*** decide on the merits of a constitutional issue, because there was no constitutional issue to decide.

If the Appellate Division based its decision solely on state law, the issue would not be cognizable in a habeas corpus action.  Claims based on violations of state law are not generally cognizable on federal habeas review.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)(citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990))(additional citation omitted); *Hameed v. Jones*, 750 F.2d 154, 160 (2d Cir. 1984), *cert. denied*, 471 U.S. 1136 (1985).  It is not the province of a federal habeas court to re-examine state court rulings on evidentiary issues. *See Estelle v. McGuire*, 502 U.S. at 67 (1991); *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.), *cert. denied*, 525 U.S. 840 (1998).

Even if the court could interpret the Appellate Division's decision as intertwined with an issue of standing to challenge the admission of the evidence, this would not assist petitioner.  As stated above, any Fourth Amendment issue is precluded by *Stone v. Powell*.  Finally, even if the court were to decide the issue, plaintiff's claim has absolutely no merit, and therefore, the Appellate Division did not act contrary to or unreasonably apply federal law in denying petitioner's claim on appeal.

Although petitioner's motion to suppress the tape stated that he did not consent to the taping, he ***did not admit*** that he was a party to the conversation, and his

16

argument that this admission was implied, simply is without merit.  Because he did not claim that he was a party to the conversation, he was not an "aggrieved person" under the Federal Wiretap Statute, nor did he have standing to challenge the constitutional issue.  Petitioner specifically **denied at trial** that he was a participant in the conversation (RA 119)[7], therefore, his attorney's failure to admit it in his motion papers is understandable.  Petitioner's further argument that the prosecutor's attempt to prove that petitioner was the individual on the telephone call conferred standing on petitioner is simply meritless.  Thus, petitioner's first habeas claim may be dismissed for a variety of reasons.

**4.**     <u>**Admission of Uncharged Crimes**</u>

Petitioner's second claim is that the trial court erred in admitting evidence of petitioner's uncharged drug-related activities.  This claim lacks merit, and there are various bases upon which to dismiss this claim.  The Appellate Division held that the trial court did not err in permitting "limited evidence" of petitioner's drug-related activities because the evidence was not admitted to show the petitioner's propensity as a drug dealer to commit the crimes charged, rather the evidence was admitted as relevant to petitioner's identity, and admitted as background evidence "inextricably interwoven with the crimes charged and much of the testimony." 268 A.D.2d at 679,

---

[7] During Mr. Vale's testimony, there was argument regarding the admission of the tape recording, and petitioner's attorney stated that "what Mr. Mueller intends to prove is that it's my client on the call number two, **and we're contesting that** ... ." (RA 119)(emphasis added).

702 N.Y.S.2d at 199-200.  The Appellate Division decided a purely state law evidentiary question in this case.  The court was not given the opportunity to decide a federal issue.  As stated above, state law violations are not cognizable in a federal habeas corpus petition. *Estelle, supra.*  The claim may be dismissed on this basis alone.

In the context of an evidentiary ruling, a writ may issue only in situations where the erroneous evidentiary ruling has rendered a trial fundamentally unfair and a federal due process issue arises. *Dunnigan v. Keane*, 137 F.3d at 125; *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.); *cert. denied* 464 U.S. 1000 (1983).  The erroneous **admission** of unfairly prejudicial evidence will constitute a denial of **due process** only if the evidence is "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan v.* Keane, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)(internal quotation marks omitted).  In short, the evidence must have been crucial, critical or highly significant. *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985).

The court would first point out that petitioner has not exhausted such a claim in state court.  The law is well-settled that prior to bringing a petition for habeas corpus pursuant to 28 U.S.C. § 2254, a petitioner must exhaust his state court remedies with respect to each claim presented in his federal application for habeas relief. *Baldwin v. Reese*, 541 U.S. 27 (2004).  The petitioner must "fairly present" his claims in each

appropriate state court, alerting the court to the ***federal nature*** of the claim. *Id.*

(quoting *Duncan v. Henry*, 513 U.S. 364, 36-66 (1995)).  The petitioner must have

informed the state court of ***both*** the factual ***and*** legal premises of the claims that he is

attempting to bring in federal court. *Id. See also Smith v. Duncan*, 411 F.3d 340, 345-

50 (2d Cir. 2005)(hearsay claim in state court was insufficient to raise constitutional

claim of denial of right to present a defense, raised for the first time in the habeas

petition).

Although there are various ways to alert the state court to a federal claim,

petitioner in this case has not utilized any of these ways in this evidentiary claim. *See*

*Daye v. Attorney General*, 696 F.2d 186, 191-92 (2d Cir. 1982).  If petitioner has not

exhausted his state court remedies, but no longer has remedies available in state court

with regard to these claims they are "deemed" exhausted but are also procedurally

defaulted. *Bossett v. Walker*, 41 F.3d 825 (2d Cir. 1994)(citing *Grey v. Hoke*, 933 F.2d

117, 120-121 (2d Cir. 1991)), *cert. denied*, 514 U.S. 1054 (1995).

A state prisoner who has procedurally defaulted on a federal claim in state court

is entitled to federal habeas review of that claim only if he can show both cause for the

default and actual prejudice resulting from the alleged violation of federal law,

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991), or establish that failure of the court

to consider the claim will result in a miscarriage of justice. *Id.* at 748.  A miscarriage

of justice will have occurred if the constitutional violation has "probably resulted in

the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

In this case, petitioner could not return to court to raise any due process claims that could be associated with his evidentiary claim because he has already raised the claim on appeal, and both the Appellate Division and the New York Court of Appeals have denied the claim. Petitioner has already presented the facts of this claim in state court on direct appeal. New York law provides for ***only one application for direct review***. N.Y. RULES OF COURT, COURT OF APPEALS, § 500.10(a). Petitioner has already had his one application, the State courts considered the claim based on state law, and petitioner cannot now return to raise the federal claim based on the same facts. Additionally, because he raised the claim on appeal, he cannot return to state court to file a collateral motion to vacate his conviction pursuant to N.Y. CRIM. PROC. LAW § 440.10(2)(a), (2)(c). This court would also point out that petitioner has had this action stayed once so that he could return to state court to exhaust claims. However, this evidentiary claim was not the claim that petitioner brought back to state court.

Therefore, the court could find the evidentiary claim both unexhausted and procedurally defaulted. There has been no showing of cause or prejudice in this case, and the claim may be dismissed on this basis.

Finally, assuming the claim were simply unexhausted, under the habeas statute,

the court may deny *unexhausted* claims *without* sending petitioner back to state court to exhaust whatever remedies he might have. 28 U.S.C. § 2254(b)(2).  The court may exercise its discretion and deny any unexhausted claims, however, the standard for whether this discretion should be exercised has not been clearly stated. *See Oraca v. Walker*, 53 F. Supp. 2d 605, 610 (S.D.N.Y. 1999).  Some courts have relied on a "patently frivolous" standard. *Id.* at 612 (citing cases).  The court in *Oraca* noted that the "real standard" being used is reaching the merits when exhaustion may be questionable, but the lack of merit is easily shown. *Id.* at 612 n.10 (citing cases).  In *Naranjo v. Fillion*, 02 Civ. 5449, 2003 U.S. Dist. LEXIS 6287, *30 (S.D.N.Y. April 16, 2003), the court found that the majority of district courts have been using the "patently frivolous" standard.

If the court were to examine the merits of this evidentiary issue, the standard applicable would be the pre-AEDPA standard, since the state court did not decide the issue on the merits because it did not decide the constitutional issue at all.  A review of the merits of petitioner's evidentiary claim shows that it has no merit.  Prior to trial, among other hearings,[8] petitioner was afforded a hearing under *People v. Ventimiglia*, 52 N.Y.2d 350, 420 N.E.2d 59, 438 N.Y.S.2d 261 (1981) and *People v. Molineux*, 168

---

[8] Petitioner also had a *Huntley* and a *Wade* hearing. *People v. Huntley*, 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).  A *Huntley* hearing challenges the admissibility of a defendant's statement.  A *Wade* hearing challenges the admissibility of identification testimony. *United States v. Wade*, 388 U.S. 218, 241-42 (1967).

N.Y. 264, 61 N.E. 286 (1901).  During a *Ventimiglia* hearing, the court assesses the

probative force and prejudicial effect of any uncharged crimes and prior bad acts

sought to be introduced at trial. *Id.  People v. Molineux*, provides for a hearing in

which the court determines whether the prosecutor will be able to introduce evidence

of prior uncharged crimes or bad acts by the defendant ***as affirmative proof at trial****.*

*See Manning v. Walker*, 99-CV-5747, 2001 U.S. Dist. Lexis 109, *7 n.4 (E.D.N.Y.

Jan. 3, 2001).  The court in *Molineux* outlined the situations in which other bad act

evidence could be introduced at trial, such as for proof of intent, motive, absence of

mistake, a common scheme or plan, or identity of the defendant. *Molineux*, 168 N.Y.

at 293.

The issue during the hearing before the trial judge was the extent to which the

evidence in this case fit into the *Molineux* exceptions. (VT 115-16).  The Appellate

Division properly found that the trial court did not err when it admitted the evidence

since the categories outlined in *Molineux* have been held to be non-exclusive, and

evidence is properly admitted if it is "inextricably intertwined with the crime

charged." *See People v. Rojas*, 97 N.Y.2d 32, 37, 735 N.Y.S.2d 470, 473, 760 N.E.2d

1265, 1268 (2001); *People v. Vails*, 43 N.Y.2d 364, 368, 401 N.Y.S.2d 479, 482, 372

N.E.2d 320, 323 (1977)(citations omitted).

Petitioner complains that the trial court should not have allowed evidence

indicating that he was a drug dealer.  However, as argued by the prosecutor during the

*Ventimiglia/Molineux* hearing, the ***only way*** that petitioner knew the victim was that he was her drug dealer, and the ***only way*** that the petitioner knew that there was a safe in Mr. Vale's home was that petitioner had been in the home in connection with his selling drugs to the victim. *Ventimiglia* Transcript (VT) at 104. The fact that petitioner was Ms. Toyloy's drug dealer was intimately intertwined with the planning of the crime.

The court stated that it wanted to be careful that the *Ventimiglia/ Molineaux* ruling "be tailored to permit the People to prove the things for which this sort of proof is permissible legally, and not go beyond the required scope... ." (VT 114). New York State case law supported both the trial court judge's finding as well as the Appellate Division's decision affirming that finding. Thus, petitioner cannot satisfy the first prong of the due process analysis. He cannot show that the evidentiary ruling was ***erroneous***. Therefore, petitioner's second claim may be dismissed.

## 5.   <u>Improper Sentencing</u>

Petitioner argues in this habeas petition that his sentence is unconstitutionally harsh and excessive. Petitioner was sentenced to an aggregate of 75 years to life imprisonment. In his Appellate Division brief, petitioner raised two arguments. The first argument was that certain crimes should not have resulted in consecutive sentences, and the second argument was that his sentence was harsh and excessive because it was disproportionate to that received by his accomplice James Young who

testified for the prosecution at trial.

The Appellate Division agreed with petitioner's first argument and held that the trial judge incorrectly made certain sentences consecutive, however, when the Appellate Division realigned the sentences, the court determined that "the aggregate sentence is unaffected."  Thus, although petitioner's argument was correct, the aggregate sentence did not change. 268 A.D.2d at 680-81, 702 N.Y.S.2d at 200.  The Appellate Division did not address petitioner's claim that his sentence was disproportionate to that of his accomplice.  In this habeas application, petitioner alleges that the sentence was disproportionate to Mr. Young, who only received seven years imprisonment.  Petitioner also appears to allege that the consecutive sentence is disproportionate to the crimes charged.

A excessive sentence claim does not present a constitutional issue when the sentence is within the range prescribed by law. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992).  Although the Appellate Division found that some of the sentences should have run concurrent to other sentences, the aggregate sentence was still 75 years to life for the crimes of felony murder, burglary, robbery, and assault, all very serious crimes that resulted in the death of one victim and the serious injury of another victim.  Additionally, petitioner was sentenced as a ***second violent felony offender***. Petitioner has not indicated how the Appellate Division's decision might have been error, and this court cannot find that the Appellate Division's new calculation was

24

incorrect.

It has been held that variations in sentencing among co-defendants does not raise constitutional issues, particularly where the co-defendant who received the lesser sentence cooperated and testified at trial. *Rodriguez v. Senkowski*, 03 Civ. 3314, 2004 U.S. Dist. LEXIS 3975, *139-41 (S.D.N.Y. March 15, 2004)(citations omitted).  Thus, the fact that petitioner received a longer sentence than Mr. Young is not an issue of constitutional magnitude.  Thus, petitioner's sentencing claim may be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: November 14, 2005

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

25